IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

NATIONAL WILDLIFE FEDERATION,
et al.,

      Plaintiffs,

      v.

GALE NORTON,

      Defendant.

CIV-S-04-0579 DFL JFM

MEMORANDUM OF OPINION
AND ORDER

Plaintiffs National Wildlife Federation, Friends of the Swainson's Hawk, Planning and Conservation League, and Sierra Club allege that the Secretary of the Interior violated the Endangered Species Act by approving the Natomas Basin Habitat Conservation Plan and issuing incidental take permits to the City of Sacramento and Sutter County.  By orders of July 2, 2004 and July 19, 2004, the court permitted the City of Sacramento, Sutter County, and several landowners in the affected area to intervene as defendants.  The parties now cross-move for summary judgment.

This is the second time that the court has been asked to

1

review a habitat conservation plan for the Basin.  See Nat'l Wildlife Fed'n v Babbitt, 128 F.Supp.2d 1274 (E.D. Cal. 2000) ("Natomas I").  In Natomas I, the court held that the habitat conservation plan was inadequate.  For the reasons that follow, the court now finds that the revised plan satisfies the requirements of the Endangered Species Act ("ESA").

I.  Background

A. History of the Habitat Conservation Plan

The Natomas Basin is a low-lying region of approximately 53,000 acres in Sacramento and Sutter Counties.  (Administrative Record ("AR") 59.)  The Basin is home to the Giant Garter Snake ("GGS") and the Swainson's Hawk, the two species of greatest concern in this litigation.  In 1993, the Secretary listed the GGS as a threatened species under the Endangered Species Act ("ESA").[1]  The Swainson's Hawk has not been listed as a threatened species by the Secretary; however, it has been so listed by the California Department of Fish and Game under the California Endangered Species Act.  14 C.C.R. § 670.5(b)(5)(A), Cal. Fish & Game Code § 2067.  The GGS is an elusive animal that lives in rice fields and drainage ditches; it is found only in rice-growing regions of the Central Valley, including rice-growing areas in the Basin and associated canals.  The Swainson's Hawk is migratory, wintering in Central and South America and

---

[1] A "threatened" species is any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range.  16 U.S.C. § 1532(20).

spending March to September in the Central Valley.  The hawk forages on small rodents found in large open fields and nests in large trees; there are approximately 50 identified hawk nesting sites in the Basin and the riparian corridor of the Sacramento river. (AR 952-55.)

The ESA conditions the Secretary's issuance of an incidental take permit ("ITP") upon her approval of a habitat conservation plan ("HCP).  The ITP allows activity, here development, that could injure or harm – "take" in the language of the statute -- an endangered or threatened species.  Without an ITP, developers would be subject to serious penalties, including criminal prosecution, for any injury to an endangered or threatened species.  16 U.S.C. §§ 1538, 1540.  The history of the development of the Natomas Basin HCP is outlined in Natomas I and need not be repeated here in detail.  See Nat'l Wildlife Fed'n v Babbitt, 128 F.Supp.2d at 1277-78.  In brief, the first HCP for the Basin was a regional conservation plan designed to cover development in the entire Basin.  Id. at 1279.  The 1997 HCP anticipated that five jurisdictions -- the City, Sacramento County, Sutter County, Reclamation District No. 10, and the Natomas Central Mutual Water Company -- would apply for ITPs.  Id.  The HCP was designed to permit development of 17,500 acres of Basin land over the 50-year life of the ITPs, with mitigation lands acquired at a .5-to-1 ratio as land was developed.  Id. at 1280.  The acquisitions were to be funded with mitigation fees paid by developers in the relevant jurisdictions.  Id.  In the

3

end, however, only the City applied for a permit under the HCP.
Despite the lack of participation by the other jurisdictions, the
Secretary granted an ITP to the City, finding that the issuance
of an ITP to the City, with the limitations imposed by the HCP,
would not likely jeopardize the continued existence of the
species covered by the HCP, including the GGS and the Swainson's
Hawk.  Id. at 1282-84.

The Secretary's issuance of an ITP to the City was
challenged by various organizations, among whom were the
plaintiffs in the present action.  On August 15, 2000, the court
found that several of the Secretary's findings were unreasonable
and violated the ESA, thereby setting aside the Secretary's
issuance of the ITP.  Id. at 1292-1300.  Specifically, the court
found that the Secretary erroneously concluded that: (1) the HCP
minimized and mitigated the impact of the permitted takings "to
the maximum extent practicable;" (2) the City had ensured
adequate funding for the mitigation plan; and (3) issuance of the
ITP to the City, in the absence of participation by the other
jurisdictions, would not jeopardize the continued existence of
the covered species.  Id.  On this last issue, the court found
that a principal failing of the 1997 ITP was that it relied upon
an HCP that took a regional approach to conservation, covering
the entire 53,000-acre Basin, when in fact only the City sought
an ITP and agreed to be bound by the HCP.  Id. at 1291, 1299.
The HCP failed to analyze possible effects on the species in the
event that the other jurisdictions -- primarily Sacramento and

Sutter counties -- failed to subscribe to the HCP.  However, the court upheld the conclusion that the HCP would not result in jeopardy to the covered species were it implemented by the five jurisdictions envisioned by the HCP.  Id. at 1295-98.

After the 1997 ITP was set aside, the City revised the HCP to address the flaws identified by the court.  Currently before the court is a revised HCP, covering development only by the City and Sutter.  This second Natomas Basin HCP ("NBHCP") was approved by the Secretary in April 2003.  At the same time, the Secretary granted ITPs to the City and Sutter, authorizing a total of 15,517 acres of development.[2]  Shortly thereafter, the Service and the Secretary issued the required supporting documents:  a Biological Opinion ("BiOp") examining effects upon the species listed in the proposed ITP, Findings and Recommendations supporting the issuance of an ITP, a final EIR/EIS, and the Record of Decision, in which the Secretary adopted the Service's findings and announced her decision to issue the ITPs.[3]

---

[2] The NBHCP also anticipates development of 1,983 acres in the Metro Air Park project.  (Pl.'s Mot. at 5-6.)  An ITP was previously issued for that project, an action the court upheld in Nat'l Wildlife Fed'n v. Norton, 306 F.Supp.2d 920 (E.D. Cal. 2004) ("Metro Air Park").  In total the NBHCP anticipates 17,500 acres of development in the Basin.

[3] The final EIR/EIS was prepared to comply with the public agencies' obligations under the National Environmental Policy Act and the California Environmental Quality Act.  The EIR/EIS evaluates a broader range of potential environmental impacts. The adequacy of the EIR/EIS is not challenged in this action. However, because the EIR/EIS is part of the record of decision, the analysis and responses to comments in the EIR/EIS are relevant to evaluating the Secretary's conclusions under the ESA.

B. <u>The Final NBHCP</u>

The purpose of the NBHCP is to "promote biological conservation in conjunction with economic and urban development within the permit area." (AR 19.)  The final NBHCP envisions participation by the City and Sutter, but does not depend on participation by both entities.  (<u>Id.</u> at 50-51.)  The NBHCP covers 22 species, with particular attention to the GGS and the Swainson's Hawk, since they are prominent in the Basin, listed as threatened under state or federal law, and occupy habitat that will also benefit other covered species.  (<u>Id.</u> at 64.)  The NBHCP anticipates that development by the City and Sutter will be limited to 15,517 acres -- 8,050 acres within the City and 7,467 acres in Sutter County –- and provides that approval of any development beyond this limit -- whether by the City and Sutter or by other entities -- will trigger reevaluation and possible amendment of the plan, and could result in suspension or revocation of the City and Sutter permits.  (<u>Id.</u> at 20, 23-26, 110.)

Like the 1997 HCP, the primary mitigation measure relied on in the NBHCP is acquisition and enhancement of reserve properties at a .5-to-1 ratio for all of the lost habitat, to be funded by developer fees.[4]  (<u>Id.</u> at 36, 169-98.)  The 8,750 acres of reserve land will be divided in the following fashion: 50% in

_____

[4] The plan also requires other minimization and avoidance measures.  In particular, the plan calls for preservation of the "Swainson's Hawk Zone," a one-mile strip of land adjacent to the Sacramento River, which contains many of the Swainson's Hawk nesting sites in the Basin.  (AR 1032, 1034.)

rice cultivation that will serve as habitat for the GGS; 25% in

managed marsh habitat for the GGS; and 25% in upland habitat that

could be used for foraging by the Swainson's Hawk.   (Id. at 37.)

The NBHCP offers the following reasons to support the adequacy of

the .5-to-1 ratio: (1) the reserves will provide higher quality

habitat than the lands to be developed, especially given that the

reserves will be managed for the covered species; (2) much of the

land to be developed is of limited value as habitat but will be

assessed as if it were of value; (3) the reserves will provide

permanent habitat for the covered species; (4) the NBHCP provides

monitoring and adaptive management to protect the species; and

(5) the reserves will be large and biologically viable.   (Id. at

132-33.)   On this last point, the NBHCP requires that, by the end

of the 50-year term of the plan, there must be one reserve of at

least 2,500 acres in size, with the remaining reserves in blocks

of 400 acres or more that will be connected by watercourses.

(Id. at 140.)   The NBHCP also provides that setback zones should

be "considered" prior to the acquisition of reserve lands and

that, if possible, reserve lands should be located 800 feet or

more from urban development.   (Id. at 142.)

    The NBHCP contains several provisions designed to ensure

that its environmental objectives will be achieved and that

development will not outpace the acquisition of mitigation lands.

One of these provisions is a 200-acre "cushion" of mitigation

land, which requires that, as of September of each year, the

Natomas Basin Conservancy ("NBC") -- which is the entity that

7

owns, acquires, and manages the reserve lands -- must have acquired at least 200 more acres of reserve land than necessary to mitigate all of the development approved to that date before any further development is permitted. (Id. at 213-14.)  This requirement is intended to assure that the NBC will never be unable to find and acquire mitigation lands for development that has already been approved.  The NBHCP also calls for increases in the mitigation fees, as necessary and without a cap, to pay for increased costs of land acquisition and reserve management. (Id. at 211.)  "Catch-up fee" ordinances enacted by the City and Sutter will require developers who have received development approval to pay the increased mitigation fees if they have not yet engaged in ground-disturbing activity. (Id. at 212.)

The NBHCP also imposes monitoring and review obligations designed to ensure that the plan will achieve the desired conservation objectives and goals.  Two types of monitoring are required by the plan: (1) compliance monitoring, to assure that the reserves are properly acquired and managed; and (2) biological effectiveness monitoring, to determine whether the assumptions of the plan hold true in practice over time. (Id. at 217-32.)  Beyond these continuing obligations, the plan also calls for broad reviews at designated development milestones.  An overall program review will be conducted once 9,000 acres of development have been approved. (Id. at 239-41.)  The overall program review will be made available for public review and comment. (Id.)  The NBHCP also calls for an independent mid-

point review by each permittee to address the possibility that development might proceed faster in one jurisdiction than the other.  (Id.)  The NBHCP also provides for "adaptive management" to respond to the monitoring, reviews, or other new scientific data.  (Id. at 234-38.)  Should the adaptive management provisions prove insufficient, the NBHCP can be amended or revised, or, in the worst case, the permits could be suspended or revoked.  (Id. at 252-56.)

The NBHCP concedes that there will be harm to the species listed in the permit, but contends that the harm will be significantly reduced by the measures described above.  (Id. at 263-330.)  The NBHCP further finds that the proposed level of mitigation is the "maximum extent practicable," relying on economic analysis.  (Id. at 332-36.)  Finally, the NBHCP concludes that the plan as proposed is the best option among other possible alternatives in light of biological and financial considerations.  (Id. at 336-38.)

Through the implementation agreement, the City and Sutter agree to be bound by the terms of the NBHCP, which are also incorporated into the ITP.  (Id. at 806-55.)

C. The 2003 Biological Opinion

The Biological Opinion ("BiOp") is an evaluation by the Service's wildlife biologists of the potential effects of issuance of the ITPs on the species identified in the plan and

the proposed ITPs.[5]  16 U.S.C. § 1536.  While acknowledging that the proposed development will have both direct and indirect negative effects on the GGS, the BiOp ultimately concludes that the ITPs will not affect the viability of the GGS population within the Natomas Basin or the viability of the species as a whole.  (AR 1028.)  This finding is based on several factors: (1) the minimization and take avoidance measures imposed by the NBHCP, including pre-construction surveys and de-watering and fencing of canals; (2) the protection, enhancement, restoration, or creation of 6,562.5 acres of higher quality reserves for the snake; (3) the maintenance of connectivity between reserve lands; (4) the continued existence of 16,000 acres of GGS habitat that will remain in the Basin after development; and (5) the creation of year-round protected habitat in the reserves specifically managed to benefit the GGS and not subject to the vagaries of rice farming.  (Id.)

The BiOp similarly acknowledges that the Swainson's Hawk will suffer some negative impacts from implementation of the proposed action, including the loss of up to 20% of its nesting habitat and 40% of its foraging habitat in the Basin, most of which is of high or moderate quality.  (Id. at 1032-37.) However, the BiOp concludes that the proposed action will not jeopardize the survival of the Central Valley population of the Swainson's Hawk or the species as a whole because: (1) the

---

[5]  The BiOp is required by the ESA because the issuance of an ITP is a federal action.  See part II.A, infra.

reserves created will provide foraging opportunities at the appropriate time of year, during nesting; (2) approximately 13,000 acres of foraging habitat will not be affected; (3) the acquired foraging habitat will be closer to the nesting trees; (4) more high quality foraging habitat will be created; and (5) significant foraging habitat exists to the west, in Yolo County. (Id. at 1039.)  In sum, the BiOp concludes that issuance of ITPs to the City and Sutter will not appreciably reduce the likelihood of the survival and recovery of these species in the wild.

D. The 2003 Findings and Recommendations

The Findings and Recommendations represent the Service's findings in light of the information in the NBHCP and the BiOp. The Service concludes that the impacts of the issuance of the ITPs will be minimized and mitigated to the maximum extent practicable.  (Id. at 1182.)  Specifically, the Service finds that the injury to the species covered by the permit will be mitigated to the maximum extent practicable by: (1) the measures identified in the NBHCP; (2) establishment, enhancement, and active management of 7,758.5 acres of high-quality reserve habitat; (3) establishment of a monitoring and reporting plan; and (4) use of a funding mechanism that contains assurances that the NBHCP will be implemented.  (Id. at 1184-85.)  The Service finds that the harm will be minor for all of the covered species, except the GGS, and that, for all covered species, including the GGS, the consequences of the harm will be effectively mitigated by the conservation measures provided for by the NBHCP.  More

specifically, as to the Swainson's Hawk, the Service determines that the degree of injury will be low because: (1) the majority of the foraging habitat that will be lost is currently not available to the hawk during its nesting season[6]; (2) substantial foraging habitat will exist in the Basin even after the planned development; and (3) substantial foraging habitat will remain in Yolo County.  (Id. at 1188-89.)  The Service further concludes that any injury will be effectively mitigated for the reasons stated in the BiOp and described above.

As to the GGS, the Service acknowledges that there is a higher likelihood of injury to the GGS, but still concludes that the injury will be effectively mitigated by the measures included in the NBHCP, including: (1) limits on construction during the GGS dormant period; (2) pre-construction surveys and dewatering; (3) the creation of managed marsh habitat; (4) the acquisition of rice fields and their management with "snake friendly practices"; and (5) the assurances of connectivity of snake habitat.  (Id. at 1190-91.)

The Findings and Recommendations conclude that, in addition to effectively mitigating for the anticipated harm, the NBHCP provides for mitigation to the "maximum extent practicable," relying on the economic analysis prepared in conjunction with the

---

[6] The Swainson's Hawk nests and breeds in the Basin from March to September.  However, under current conditions, much of the potential foraging habitat is cultivated with crops that either do not provide good foraging habitat for the Swainson's Hawk or do not provide good foraging habitat until August or September, after young have fledged.  (AR 725-49.)

NBHCP.  (Id. at 1192-93.)   The Findings and Recommendations likewise conclude that the City and Sutter have ensured adequate funding for the plan through: (1) the mitigation fee program, which includes five different components and which is not capped; (2) the catch-up fee ordinance; and (3) the 200-acre cushion of mitigation land.  (Id. at 1194-95.)   Finally, the Findings and Recommendations conclude that the issuance of the ITPs will not appreciably reduce the likelihood of survival and recovery of any of the covered species, including the Swainson's Hawk and GGS.  (Id. at 1196-99.)   In accordance with these Findings, the Service recommends that the Secretary of the Interior approve the ITPs for the City and Sutter.

The Findings and Recommendations became the decision of the Secretary of Interior once she adopted them in the Record of Decision and issued the two ITPs.[7]  This suit followed in March 2004.  Plaintiffs seek a ruling that the Secretary's findings are not supported by the record and that the Secretary's approval of the NBHCP and issuance of the ITPs should be revoked.

## II.   Statutory Standards and Requirements

### A.  The Endangered Species Act

The purpose of the ESA is to "conserve ecosystems upon which endangered and threatened species depend" and "to provide a

---

[7] Although the Secretary made the final decision to issue an ITP, her conclusions depend on the analysis and findings of the Service.  Therefore, although the Secretary is the named defendant in this case, the court will frequently refer to the BiOp and Findings and Recommendations of the Service in reviewing the decision of the Secretary.

1  program for the conservation of such endangered species."  16

2  U.S.C. § 1531(b).  As a means of achieving this goal, Section 9

3  of the ESA prohibits private individuals from "taking" endangered

4  or threatened species.  Id. § 1538(a)(1)(B).  The ESA defines

5  "take" to include "harm" to animals.  Id. § 1532(19).  The

6  Service has defined "harm," within the meaning of "take," to

7  include "significant habitat modification or degradation where it

8  actually kills or injures wildlife," a definition that has been

9  upheld by the Supreme Court.  50 C.F.R. § 17.3 (2004); Babbitt v.

10 Sweet Home Chapter for Cmtys. for a Great Or., 515 U.S. 687, 696,

11 115 S.Ct. 2407 (1995).

12     The broad scope of Section 9 is limited by several

13 exceptions, found in Section 10.  Specifically, Section 10

14 authorizes the Secretary to issue a permit, an ITP, for any

15 taking that is incidental to the carrying out of an otherwise

16 lawful activity.  16 U.S.C. § 1539(a)(1)(B).  To receive an ITP,

17 the permit applicant must submit an HCP that specifies: (i) the

18 impact which will likely result from such taking; (ii) what steps

19 the applicant will take to minimize and mitigate such impacts,

20 and the funding that will be available to implement such steps;

21 (iii) what alternative actions to such taking that the applicant

22 considered and the reasons why such alternatives were not

23 selected; and (iv) such other measures that the Secretary may

24 require as necessary or appropriate for the purposes of the plan.

25 Id. § 1539(a)(2)(A); 50 C.F.R. § 17.22 (2004).  The Secretary

26 must issue an ITP upon finding that: (i) the taking will be

14

incidental; (ii) the applicant will, to the maximum extent

practicable, minimize and mitigate the impacts of the taking;

(iii) the applicant has ensured adequate funding for the HCP;

(iv) the taking will not appreciably reduce the likelihood of the

survival and recovery of the species in the wild; and (v) any

additional measures required by the Secretary will be undertaken.

16 U.S.C. § 1539(a)(2)(B).

Section 7 of the ESA applies to federal actions, and

requires federal agencies, through consultation with the Service,

"to insure that any action authorized, funded, or carried out" by

the agency is "not likely to jeopardize the continued existence

of any endangered species or threatened species." Id. §

1536(a)(2). Issuance of an ITP is an agency action that requires

the Service to engage in internal consultation and prepare a BiOp

evaluating whether issuance of the ITP will result in jeopardy to

any endangered or threatened species. Id. § 1536(b). An action

will result in "jeopardy" if it will "reduce appreciably the

likelihood of both the survival and recovery of a listed species

in the wild. . . ." 50 C.F.R. § 402.02 (2004). The required

jeopardy analysis under Section 7(a)(2) is identical in almost

all respects to the inquiry under Section 10(a)(2)(B)(iv).

Natomas I, 128 F.Supp.2d at 1286. In considering whether the

action will jeopardize a species, the Service must evaluate the

effects of the action and any cumulative effects on the listed

species.[8]  50 C.F.R. § 402.14(g) (2004).

B. The Administrative Procedure Act

Review of final agency actions under the ESA is governed by the Administrative Procedure Act ("APA").  5 U.S.C. § 706; Pacific Coast Fed'n of Fishermen's Ass'ns v. NMFS, 265 F.3d 1028, 1034 (9th Cir. 2001).  The APA provides that the court must "hold unlawful and set aside agency action, findings and conclusions" that are "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  An agency action is arbitrary and capricious if the agency failed to consider relevant factors, failed to articulate a rational connection between the facts found and the choice made, or made a clear error of judgment.  Baltimore Gas & Elec. Co. v. NRDC, 490 U.S. 87, 105-06, 103 S.Ct. 2246 (1983); Pacific Coast Fed'n of Fishermen's Ass'ns, 265 F.3d at 1034; Greenpeace v. NMFS, 80 F.Supp.2d 1137, 1150 (W.D. Wash. 2000).  Review under this standard is "searching and careful," but "narrow."  Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378, 109 S.Ct. 1851 (1989). The court should not substitute its judgment for that of the agency, but rather must determine whether the evidence in the

---

[8]  "Effects of the action" are the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent on that action, that will be added to the environmental baseline.  50 C.F.R. § 402.02 (2004).  "Cumulative effects" are "those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation."  Id.

administrative record permitted the agency to make the decision
it did.  Baltimore Gas & Elec. Co., 462 U.S. at 97; Occidental
Eng'g Co. v. INS, 753 F.2d 766, 769-70 (9th Cir. 1985).  The
agency decision need not be ideal, so long as the agency gave at
least minimal consideration to the relevant facts contained in
the record.  Southwest Ctr. for Biological Diversity v. Bureau of
Reclamation, 143 F.3d 515, 523, quoting Ctr. for Marine
Conservation v. Brown, 917 F.Supp. 1128, 1143 (S.D. Tex. 1996).

Deference to the agency is especially appropriate where the
challenged decision relies upon the agency's expertise.  Mt.
Graham Red Squirrel v. Espy, 986 F.2d 1568, 1571 (9th Cir. 1993).
The court should defer to the agency's reasonable interpretation
and resolution of equivocal or conflicting evidence, including
conflicting expert opinions.  Friends of Endangered Species, Inc.
v. Jantzen, 760 F.2d 976, 986 (9th Cir. 1985); Cent. Ariz. Water
Conservation Dist. v. EPA, 990 F.2d 1531, 1539 (9th Cir. 1993).

Plaintiffs challenge three of the Secretary's conclusions as
arbitrary and capricious under the APA: (1) that the injury to
the GGS and Swainson's Hawk will not appreciably reduce the
likelihood of survival and recovery of these species; (2) that
the NBHCP will minimize and mitigate the effects of any taking to
the maximum extent practicable; and (3) that the City and Sutter
will ensure adequate funding for the required mitigation.
(Compl. ¶¶ 55-72.)[9]  The court addresses these three contentions

_____

[9] Defendants do not contest plaintiffs' standing to
challenge the Secretary's issuance of the ITPs and approval of
the NBHCP.

in the following sections.

### III.   No Jeopardy to Survival Findings

Plaintiffs allege that the Secretary erroneously concluded that development activity permitted under the NBHCP will not appreciably reduce the likelihood of the survival and recovery of the Swainson's Hawk and the GGS.  16 U.S.C. §§ 1536, 1539.  At the heart of plaintiffs' argument is their contention that the Secretary gave insufficient consideration to the development that is likely to occur in the remainder of the Basin, outside the City's current boundaries and Sutter County, over the 50-year term of the NBHCP, and to the effect of this additional development on the viability and efficacy of the planned reserves and the survival of the species.  (Pls.' Mot. at 19.) Plaintiffs' arguments generally fall into three categories: (1) the Service failed to analyze the lack of binding commitments from other jurisdictions and, at the same time, erroneously relied on voluntary mitigation measures by those jurisdictions; (2) the Service failed to consider the cumulative impacts of other proposed projects in the Basin; and (3) the Service failed to consider the lack of protection of the 800-foot reserve setbacks.

A. Failure to Analyze the Lack of Binding Commitments by
   Other Jurisdictions

Plaintiffs argue that the Service failed to address the lack of binding commitments to the NBHCP by other entities -- namely, the County of Sacramento, the Natomas Mutual Water Company, and

Reclamation District 1000 -- and instead assumed that these entities will continue their current course of conduct. (Id.) Plaintiffs rely on Natomas I, in which the court faulted the Secretary for issuing an ITP to the City alone, based on a regional HCP that assumed participation of five jurisdictions. 128 F.Supp.2d at 1295-96, 1299. However, unlike the 1997 HCP, the non-participation of the other jurisdictions is specifically considered and addressed in the present NBHCP; the Secretary determined that the lack of participation would not negatively impact implementation of the plan.

As to the water agencies, plaintiffs argue that the plan erroneously assumes that the water agencies will continue to maintain the network of canals and irrigation ditches that will connect the reserves. All parties agree that the connectivity of habitat provided by the irrigation system is essential to the survival of the GGS. In response, defendants contend that this issue was looked at in great detail and that, for a number of reasons, the Service reasonably concluded that hydrological connectivity would not be affected by the failure of the water districts to participate. First, the Service found that connectivity corridors will remain open because they will continue to be needed for drainage and irrigation of agricultural lands. (AR 1611-14.) Of course, this assumes that much of the Basin will continue in agriculture, a point addressed further below, but if this assumption is correct then irrigation canals will still be necessary. The Service further analyzed whether

current management practices by farmers and the water agencies
are sufficient to protect the snake as it moves through the
corridors and concluded that they are.  (Id.) Second, the Service
reasoned that any decision by the water agencies to close or fill
the canals would necessarily require further federal
consultation, either because the activity would result in a
"taking" under the ESA or because it would require a § 404 Clean
Water Act permit, and that any adverse impacts to the GGS could
be mitigated at that time.  (Id.)  Third, the Service noted that
the NBHCP includes other measures to protect connectivity,
including yearly evaluations of connectivity and the use of
mitigation fees to purchase canals or channels, if needed.  (Id.)
Finally, and closely related to the third point, the Service also
relied on the NBC's status as a landowner and, therefore, as a
shareholder in the Natomas Mutual Water Company, increasingly
able to influence the water company's decision-making as the NBC
acquires new land and shares.  (Id. at 1612, 1028.)

        The issue of connectivity is discussed in the NBHCP, the
BiOp, and in the Final EIR/EIS, both as part of the original
analysis and in response to comments.  (Id. at 134-37; 888-90,
1027-28, 1611-14, 1955-58, 1999-2000, 2005-06, 2132-44.)  All of
the arguments now advanced by defendants have been addressed in
these documents.  Taken together, the four considerations
advanced by the Service rationally explain how connectivity will
be maintained.  It cannot fairly be said that the Service and, by
extension, the Secretary, failed to consider the issue.  Nor does

it appear, in light of the evidence in the record, that the Secretary was "arbitrary and capricious" or made a clear error of judgment in concluding that connectivity would not be significantly affected by the failure of the water agencies to participate.

Plaintiffs similarly argue that the Secretary failed to consider the non-participation of Sacramento County and erroneously assumed that Sacramento County's land in the Basin will remain devoted to agricultural uses. (Pls.' Mot. at 19-21.) The NBHCP and the BiOp do assume that development in the Basin will be limited to the 17,500 acres in the permit areas and relies on that assumption in concluding that sufficient habitat will remain for the covered species. (AR 1026.)  This assumption is based on the current land use plans of Sacramento County. (Id. at 121, 1055.)  The NBHCP, BiOp, and EIR/EIS also conclude that because any future development in the Basin not covered by the HCP and ITPs would likely result in injury to listed species, any future development in the Basin would require new federal approvals.  Any such approvals would in turn require a new HCP and ITP for the particular project, and could also lead to revision of the existing NBHCP, were the additional development to exceed the assumed limits in the NBHCP.  (Id. at 121, 1055, 1617-32.)  The court previously upheld reliance of the Service on the general plans of the City, Sutter, and Sacramento County to determine the probable extent of development and the likely impacts to the covered species.  Natomas I, 128 F.Supp.2d at

1296.  Although these plans can be changed, they are the best

current information about future development.  Given that any

development outside of the NBHCP would be subject to its own

environmental review, the decision of the Service to rely on the

general plan of Sacramento County to predict future development

in Sacramento County is not unreasonable.[10]

Plaintiffs also argue that the Service ignored the

development of "agricultural-residential rural estates" and other

small projects in Sacramento County whose impacts have not, and

will not, be mitigated.  (Pls.' Reply at 8, 14-15, 20-22.)

However, the impacts of such developments were considered in the

NBHCP and the EIR/EIS, and their impact was determined to be

small.  (AR at 61, 1630, 1979, 2082-83.)  The Service considered

these developments and rationally determined that they would not

result in jeopardy to the covered species.

Finally, plaintiffs cite a number of cases for the

proposition that the Service cannot rely on "voluntary" and

"speculative" mitigation measures by the water agencies,

_____

[10]  One of the benefits of a regional HCP is that it removes
the incentive to be among the first to develop and the potential
unfairness to those landowners who, for whatever reason, choose
to develop at a later time.  Those who develop at the end of the
line may find that they cannot obtain an ITP because so much
habitat has already been affected by earlier development.  The
same dynamic occurs as between regional HCPs.  Thus, the decision
not to participate in the NBHCP may place Sacramento County in a
more difficult position if it later seeks an ITP. Thus, while
plaintiffs contend that future development will vitiate the
NBHCP, it is more likely that, if future development in the
County will have this effect, the Secretary will decline to issue
ITPs for development in the County or will insist on mitigation
that may be considerably greater than that required by the NBHCP.

individual landowners, or Sacramento County in reaching a no-jeopardy conclusion. (Pls.' Mot. 21-22 n.12; Pls.' Reply at 13.) However, in the cases cited by plaintiffs, the Service assumed that the third-party would undertake affirmative acts that would mitigate injury to a species, even though those actions were speculative or voluntary. In this case, by contrast, the Service merely evaluated the baseline conditions in the Basin and concluded, based on articulated reasons, that those conditions were not reasonably likely to change without further federal review and approval.

Accordingly, the Secretary's finding that the failure of other jurisdictions to participate in the NBHCP does not undermine its effectiveness is not arbitrary, capricious or clearly erroneous. The fatal flaw of the earlier HCP was that it was a regional conservation plan that assumed all jurisdictions would participate and gave no attention to the possibility that some would not. 128 F.Supp.2d at 1291. This plan, by contrast, focuses on the two permittees and explains why further development or action by any other entity would require additional federal approvals. The plan does not assume or require the participation of any third parties to be effective. Plaintiffs' claim that the plan depends on the voluntary actions of third-parties is without merit.

B. Failure to Consider the Cumulative Impacts of the Joint Vision MOU and Other Proposed Projects

Plaintiffs argue that the Service failed to undertake an

adequate cumulative effects analysis, as required by the ESA, because it failed to consider the impacts of the so-called "Joint Vision" development and other proposed projects.  (Pls.' Mot. at 22-31.)  Specifically, plaintiffs focus on a Memorandum of Understanding entered into in December 2002 by the City of Sacramento and Sacramento County, commonly referred to as the "Joint Vision MOU," which sets forth several principles for going forward with annexation and urbanization of 10,000 acres in Sacramento County currently designated for agricultural use. (Id.)  This 10,000-acre area is not part of the 17,500 acres that the NBHCP projects for development in the entire Basin and, were development of the 10,000 acres to occur, this might well be a significant change in circumstances that could destroy the effectiveness of the NBHCP.  Because the "Joint Vision MOU" is by no means a concrete plan for development, the court finds that the Service was correct in finding that the lands covered by the MOU are not reasonably likely to be developed and, therefore, need not be the subject of a cumulative effects analysis.

The purpose of the Joint Vision MOU is to "define a mutually acceptable set of proposed principles that the City and [Sacramento] County are prepared to consider when considering future land use planning" in the Basin.  (AR 2374.)  The principles set forth are "intended to guide future discussion and the ultimate negotiation of an agreement between the County and the City."  (Id. at 2377.)  The MOU asserts that growth in the Basin is "inevitable," and assigns to the City the primary

responsibility for planning new growth in the area.  (Id. at 2373, 2375.)  However, the MOU also contemplates that any implementation of its principles will require discretionary legislative actions by the relevant land-use jurisdictions and further state and federal environmental review.  (Id. at 2374-75.)

The ESA requires the Service, in evaluating whether the ITP will affect the likelihood of survival and recovery of the covered species, to consider "cumulative effects" on the species. 50 C.F.R. § 402.02 (2004).  These effects are defined to include the "effects of future state or private actions, not involving federal activities, that are reasonably likely to occur."  Id. By negative implication, the Service is not required to analyze the effects of future federal actions.  Similarly, it is not required to analyze non-federal actions that are not reasonably likely to occur.  Future federal actions include actions that require federal authorization, through permitting or funding. Loggerhead Turtle v. County of Volusia, 120 F.Supp.2d 1005, 1017 n.20 (M.D. Fla. 2000); Cal. Native Plant Soc.'y v. Norton, 2004 WL 1118537 at *14 (S.D. Cal. Feb. 10, 2004).  Although the regulations do not define when an effect is "reasonably certain" to occur, the FWS HCP Handbook offers the following explanation[11]:

_____

[11] Defendants argue that the Handbook is entitled to deference under the standard set forth in United States v. Mead Corp., 533 U.S. 218, 226-27, 121 S.Ct. 2164 (2001).  Plaintiffs do not dispute that the interpretation of "reasonably certain" in the Handbook is entitled to deference, nor do they offer an

> the more State, tribal, or local administrative
> discretion remaining to be exercised before a
> proposed non-federal action can proceed, the less
> there is a reasonable certainty the project will be
> authorized.  Speculative non-federal actions that may
> never be implemented are not factored into the
> cumulative effects analysis . . . .  The action agency
> should consider the economic, administrative, and legal
> hurdles remaining before the action proceeds.

United States Fish & Wildlife Service and National Marine

Fisheries Service, Endangered Species Act Consultation Handbook

4-30 (1998).

In support of their argument that the "no jeopardy" finding

was arbitrary and capricious in light of the cumulative effects

on the species, plaintiffs contend: (1) the additional 10,000

acres of development proposed in the MOU is reasonably certain to

occur; (2) the development of this acreage fatally undermines the

NBHCP; (3) the development will not necessarily require further

federal approval; and (4) the Service was required to consider

its effects upon the species covered by the ITP but failed to do

---

alternate interpretation of the term.  In enacting the ESA,
Congress gave the Service authority to promulgate binding
regulations.  16 U.S.C. § 1540(f).  However, the Handbook
definition is not a regulation, but a mere interpretation of a
regulation.  The court in Mead explicitly found that
interpretations contained in agency manuals are not entitled to
the highest level of deference.  533 U.S. at 234.  Nonetheless, a
court may still defer to an agency's interpretation of its own
regulation, depending upon "the thoroughness evident in its
consideration, the validity of its reasoning, its consistency
with earlier and later pronouncements, and all those factors
which give it power to persuade, if lacking power to control."
Id. at 227-230, 234-38, quoting Skidmore v. Swift & Co., 323 U.S.
134, 140, 65 S.Ct. 161 (1944).  Applying this standard, the court
finds that the Service's interpretation is entitled to deference
and is a reasonable construction of the regulation.

so.  (Pls.' Mot. at 22-31.)

In concluding that development of the 10,000 acres within the Joint Vision MOU was not "reasonably certain," the Service relied on the numerous discretionary steps remaining before any development could occur, and the preliminary nature of the Joint Vision MOU.  These discretionary steps include: land-use planning, environmental review, biological resources evaluation, compliance with local, state, and federal laws, and approval of the plan by the City, County, and Local Agency Formation Commission ("LAFCO").  (AR 1617.)  If these regulatory hurdles are surmounted, further review will be required by federal agencies under the ESA and the NBHCP.

Furthermore, the Joint Vision MOU is only a "conceptual agreement" designed to "establish principles to form the parameters of a future agreement or agreements."  (Id. at 2373.) The MOU is not a concrete development proposal establishing a set level of development or land use patterns.  (Id. at 2373-77.) No funds are committed.  (Id.)  The MOU does not change the existing agricultural-use designation for any of the 10,000 acres.  (Id. at 2374.)  The MOU does not waive any existing land use requirements but explicitly contemplates the necessity for further discretionary approvals and environmental review.  (Id.) Given the tentative, general nature of the MOU and the considerable number of local, state, and federal approvals that would be required before any development of the 10,000 acres could occur, the Service did not err in determining that the

Joint Vision development was not reasonably certain to occur and need not be considered by the Service in conducting its jeopardy analysis.

In addition, the Service reasonably concluded that the MOU would require federal action because any future development will require: (1) a new ITP and therefore a new evaluation by the Service of possible injury to protected species from that development if the ITP is approved; and (2) a reevaluation of the efficacy of the NBHCP in light of the proposed development. Indeed, the City has a powerful incentive to assure that development under the MOU is consistent with federal requirements; through the implementation agreement, the City has committed to ensuring that additional development does not occur in the Basin without federal review.  Thus, were the MOU lands to develop without federal review -- an unlikely prospect given that the MOU assigns control to the City -- the City could face revocation of its existing ITP under the NBHCP.  (Id. at 20-21.) Therefore, any further development will necessarily be a federal action because further federal approval will be required under any scenario that could impair the efficacy of the NBHCP.[12]   The

_____

[12] Plaintiffs cite two cases for the proposition that the MOU must be considered now as a cumulative impact.  Neither case is binding and neither is on point.  In NWF v. Norton, 332 F.Supp.2d 170,177-79 (D.D.C. 2004), the court found that the Service entirely ignored small-scale state and local projects that were reasonably certain to occur and, in fact, ignored its own conclusion that habitat degradation was a significant threat to the panther.  Here, the Service explicitly considered the possibility of additional development and determined that any development would be subject to additional federal review.  In Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv., 2005 WL

Service is entitled to assume that private individuals and the relevant agencies will seek the required federal approvals before proceeding with activities that could result in a taking of a protected species.  Natomas I, 128 F.Supp.2d at 1298.  The determination of the Service that any development under the Joint Vision MOU would be a federal action and, therefore, need not be included in the cumulative effects analysis, is not arbitrary or clearly erroneous, particularly given that development of the 10,000 acres is not "reasonably certain" to occur.

C. Impact of the Joint Vision on the Acquisition of Reserves

Plaintiffs argue that, in addition to the direct destruction of 10,000 acres of habitat through the Joint Vision development addressed above, the Service also should have considered the probable effect of the Joint Vision development on the ability of the NBC to acquire sufficient reserves.  (Pls.' Mot. at 30.) Plaintiffs argue that, of the 53,000 acres in the Basin, 7,000 acres are already developed, 17,500 acres are approved for development under the NBHCP, and 10,000 are contemplated for development under the Joint Vision, leaving only 18,000 acres for mitigation of the impacts of both the NBHCP development and the Joint Vision development.  (Id.)

Plaintiffs' scenario is unlikely and, more importantly, is

_____

1278878 at *18-21 (D.Or. 2001), the court held that the agency had the discretion to consider the impacts of future actions that were reasonably certain to occur, even though such actions would require additional federal approvals, not that it was required to do so.

adequately addressed in the record.  First, as discussed above,
at this point, the Joint Vision development is not reasonably
likely to occur.  Second, if and when a concrete development
proposal is put forth, it will be the subject of additional
federal and state environmental review.  The Service, and the
court, are entitled to assume at this point that future
development will not be permitted if sufficient mitigation land
is unavailable and the development will result in jeopardy.[13]
Furthermore, the NBHCP provides a fail-safe measure to ensure a
sufficient supply of mitigation land.  The NBHCP provides that,
if off-site mitigation land is not available for purchase by the
NBC, development must either stop or the developer must provide
an in-lieu dedication of sufficient mitigation land. (AR 804.)
Finally, the EIR/EIS did consider the impact of the Joint Vision
on the acquisition of mitigation lands, but concluded that it was
not a pressing concern at this time, for the reasons addressed
above.  (Id. at 1618.)  For these same reasons, the court finds
that the Service did not clearly err in concluding that the
Joint Vision MOU does not vitiate the NBHCP.

D. Other Proposed Developments

        Finally, plaintiffs argue that the Service erred in failing

---

        [13] The court notes, however, that the Service and those
seeking an ITP in the future will face an uphill battle if they
attempt to argue that additional development in the Basin beyond
17,500 acres will not result in jeopardy.  The NBHCP, BiOp,
EIR/EIS, and Findings and Recommendations are all predicated on
the assumption that development in the Basin will be limited to
17,500 acres and that the remaining lands will remain in
agricultural use.  (AR 20-24, 862, 866-67, 1171-72, 1617-18.)

1    to analyze the cumulative impacts of other specific development

2    proposals moving forward in the Basin.  (Pls.' Mot. at 22-27.)

3    However, the final EIR/EIS specifies that all of these projects

4    will require future federal approval because they are not covered

5    by any of the ITPs issued under the NBHCP.  (AR 1624-31.)

6    Moreover, the record reflects multiple reasons why the Service

7    concluded that these developments are not reasonably certain to

8    occur: (1) the areas are not currently planned for urban

9    development under existing land use plans; (2) the lands are

10   located outside the City's sphere of influence, the City limits,

11   and the urban services boundary; (3) no urban services are

12   available; and (4) there are significant legal and planning

13   hurdles to development.  (Id. at 1055, 1216, 1614-32.)

14   Plaintiffs, by contrast, present no evidence in the record

15   showing that these projects are anything more than the optimistic

16   day dreams of developers.  In light of the reasoned analysis by

17   the Service as to why the impacts of these proposals need not be

18   considered, and in the absence of any evidence that the Service

19   made a clear error of judgment, the decision to exclude

20   consideration of these projects was not arbitrary or clearly

21   erroneous.

22   E.   Failure to Consider the Lack of Protection of Setbacks

23        Finally, plaintiffs argue that the no-jeopardy conclusion

24   was erroneous because it depends on 800-foot setbacks for the

25   reserve lands but does not protect the setbacks from development.

26   (Pls.' Mot. at 32; Pls.' Reply at 26.)  As discussed above, one

31

1   of the acquisition criteria for reserve lands is that they should

2   be located at least 800 feet from lands currently designated or

3   used for urban development.  (AR 889.)  The plan does not

4   contemplate that the setback lands will be acquired by the NBC,

5   but assumes that the setback areas will be agricultural lands

6   within the Basin.  (Id. 889-90.)  However, after reserve lands

7   are acquired, the setbacks are not required to be managed in any

8   particular fashion and later could be used for urban development.

9   (Id.)  Plaintiffs argue that the failure to protect the setbacks

10  fatally undermines the no-jeopardy conclusion.  (Pls.' Mot. at

11  32; Pls.' Reply at 26.)

12       However, the Service explicitly stated in the BiOp that the

13  setbacks are not a permanent aspect of the mitigation program but

14  are, instead, a mere acquisition criteria, to be considered and

15  achieved, if possible.  (AR 889-90.)  Therefore, the Service's

16  no-jeopardy conclusion did not erroneously assume or depend on

17  permanent protection of the 800-foot setbacks.  Moreover, the

18  NBHCP provides for re-evaluation of the status and adequacy of

19  the setback criteria during the mid-point reviews.  (Id. at 142-

20  3.)  The Service's determination that the reserve system would

21  prevent jeopardy to the GGS and Swainson's Hawk considered the

22  potential impact of development in the setback zone.  This

23  determination was not arbitrary or capricious.

24  F.  Summary

25       In sum, plaintiffs have not pointed to evidence

26  demonstrating that the "no-jeopardy" finding was arbitrary and

capricious.  Although the Secretary did not reach the conclusions

plaintiffs desire, the record indicates that the Secretary

considered the relevant factors and articulated a rational

connection between the facts found and the conclusions reached.

The Service addressed the non-participation of other agencies,

considered the potential Joint Vision development plan, and did

not depend on the 800-foot preferred setbacks in reaching the no-

jeopardy conclusion.  The no jeopardy finding is not arbitrary or

clearly erroneous.

## IV.   Mitigate to the Maximum Extent Practicable

Prior to issuing an ITP, the Secretary must determine that

the permit applicant will, to the maximum extent practicable,

minimize and mitigate the impacts of the taking.  16 U.S.C. §

1539(a)(2)(B)(ii).  There are two components to this finding: (1)

the adequacy of the mitigation program in proportion to the level

of injury -- take -- that will result; and (2) whether the

mitigation is the maximum that can be practically implemented by

the applicant.  Metro Air Park, 306 F.Supp.2d at 927-28.  These

two factors are evaluated on a sliding scale, such that a

stronger showing on one factor may compensate for a weaker

showing on the other.  Id.  For instance, where the habitat lost

is of minimal or no value to the covered species and the

mitigation plan more than compensates for the level of injury,

the applicant need not do more, even if it would be financially

feasible.  Id. at 928.  Here, plaintiffs assert that the

Service's findings on both aspects are arbitrary and capricious.

A. <u>Proportionality to the Injury</u>

Plaintiffs argue that the Service erred in finding that the .5-to-1 mitigation ratio sufficiently compensates for the injury that will occur to the GGS and the Swainson's Hawk as a result of the development authorized by the ITPs. (Pls.' Mot. at 35.)

1. Giant Garter Snake

As a result of the development authorized by the ITPs, 8,512 acres of GGS snake habitat will be destroyed. (AR 1021.) The Service determined that, if unmitigated, this would result in considerable harm to the GGS. (<u>Id.</u> at 1190.) However, this habitat will be replaced by 2,187 acres of restored marshlands and 4,375 acres of rice habitat, resulting in an effective mitigation ratio, for the GGS, of approximately .75-to-1. (<u>Id.</u> at 1191.)

The Service offers several reasons why the reserve lands adequately compensate for the loss of some habitat. Unlike existing habitat, reserve habitat: (1) will be protected in perpetuity; (2) will be actively managed for the snake; (3) will not be subject to the continual disturbance caused by farming or canal maintenance; (4) will be available year round; (5) will not be unavailable to the snake because of canal maintenance activities; and (6) will be relatively free of human intrusion. (<u>Id.</u> 1026, 1191.) The restored marsh is considered particularly valuable replacement habitat, as it is the preferred habitat for the GGS. (<u>Id.</u> at 1191.) The Service also emphasizes the provisions of the NBHCP that preserve connectivity and minimize

34

1  disturbances during construction activity.  (Id. at 1190-92.)

2  The Service concludes that the combination of on-site

3  minimization measures and the new high-quality wetland habitat

4  will effectively mitigate for the harm to the GGS of the

5  development permitted by the ITP and the NBHCP.  (Id. at 1192.)

6  The Service's analysis considers the relevant issues and is a

7  reasoned explanation as to why the mitigation measures are

8  proportionate to the possible injury or take.

9      2. Swainson's Hawk

10      Two types of Swainson's Hawk habitat will be affected by the

11  development authorized by the ITPs: nesting habitat and foraging

12  habitat.  (Id. at 1188-89.)  Approximately 80% of the nesting

13  habitat in the Basin, most of it in the Swainson's Hawk Zone,

14  will remain after the authorized development.  (Id. at 1032.)

15  Although four nest trees will be removed as a result of the

16  authorized development, the City has committed to planting 60

17  replacement nesting trees.  (Id. at 1033.)  The Service

18  determined that this was adequate to mitigate for the removal of

19  nest trees and the small loss of nesting habitat, particularly

20  given that most of the nesting trees in the area of authorized

21  development are not active.  (Id. at 1034.)  Plaintiffs do not

22  point to any evidence in the record to contradict this

23  conclusion, or any evidence that the Service should have

24  considered, but did not.  The Service evaluated the available

25  scientific information and reached a reasonable conclusion that

26  the effects to nesting habitat would be fully mitigated.

The impact to Swainson's Hawk foraging habitat is quantitatively more significant.  Approximately 40% of the Basin's potential foraging habitat, some 9,188 acres, will be lost as a result of the authorized development.  (Id. at 1034.) The NBHCP provides for acquisition of 2,187.5 acres of high-quality upland foraging habitat.  (Id. at 731.)  Approximately 1,000 acres of additional foraging habitat will be available through the fallowed rice lands and upland components of the managed marsh.  (Id. at 732.)  However, even with the reserve lands, there will be a net loss of approximately 6,000 acres of potential foraging habitat.

Nonetheless, the Service concludes, for reasons discussed at length in the BiOp, the Findings and Recommendations, and an Addendum to the EIR/EIS, that the loss of this habitat would result in a low level of harm to the hawk if mitigated as required by the NBHCP.  (Id. at 1034-39, 1189-90, 726-47.)   The Service concludes that despite the quantitative losses in habitat, the replacement habitat will likely be qualitatively equivalent.  (Id.)  The technical memorandum identifies at least three reasons why the Swainson's Hawk will not be negatively affected by the loss of habitat.  First, the 2,187.5 acres of replacement habitat will all be of high quality, managed specifically for the hawk.  (Id. at 731.)  Even under the worst-case implementation scenario, where more than half of the reserve lands would consist of current high-value habitat, rather than newly created high-value habitat, the NBHCP will result in an

1   increase of 353 acres of high-value habitat.[14]   (Id. at 742.)

2       Second, under the NBHCP, the temporal availability of

3   foraging opportunities would be maintained or improved.  (Id.)

4   Under current conditions, much of potential foraging habitat is

5   available in September, when row crops such as corn are

6   harvested, and in June.  (Id. at 737.)  By contrast, relatively

7   little foraging habitat is available during the other months the

8   Swainson's Hawk is in the Basin -- April, May, July, and August.

9   (Id.)  Under the most likely implementation scenarios for the

10  NBHCP, foraging opportunities would be increased during the

11  months of April, May, and June, with the anticipated effect of

12  increasing nesting density and reproductive success.  (Id. at

13  740-41, 744.)

14      Third, the acquired reserves will likely be in closer

15  proximity to nesting trees.  (Id. at 745.)  A primary acquisition

16  criteria for upland reserves is proximity to known or potential

17  nesting trees.  (Id. at 156.)  Proximity of foraging habitat to

18  nesting trees has been linked to reproductive success for the

19  Swainson's Hawk.  (Id. at 738.)  For all of these reasons, the

20  Service concludes that any harm to the Swainson's Hawk as a

21  result of lost foraging lands will be effectively mitigated by

22  the reserve lands.  The Service considered the relevant

23  scientific evidence in the record and articulated reasons for its

24

25      [14] The analysis also offers several reasons why this
    situation, "Scenario 3," is not likely to occur.  (AR 745.)
26  Instead, Scenario 1 or 2, which both result in a net increase of
    1,455 acres of high-value habitat, are determined to be more
    likely to occur.  (Id.)

ultimate conclusion that the mitigation was sufficient.

In response to this technical analysis, plaintiffs point to a letter from James Estep, a leading expert on the Swainson's Hawk and Chair of the Swainson's Hawk Technical Advisory Committee.  (<u>Id.</u> at 1244-46.)  In his letter, Estep references earlier comments submitted by the Swainson's Hawk Technical Advisory Committee, which indicated that increased foraging habitat is needed to protect the Swainson's Hawk from losses. (<u>Id.</u>)  He then criticizes the technical analysis prepared in response to these comments.  (<u>Id.</u>)  Specifically, while Estep admits that it is "literally possible" to double rodent production on half the foraging land, he asserts that this concept has "since been widely dismissed."  (<u>Id.</u> at 1245.)  He calls Appendix K an "attempt to construct models designed to justify the same flawed biological reasoning."  (<u>Id.</u>)

This single letter from a respected expert is insufficient to show that the Service's conclusions are arbitrary or clearly erroneous.  The Service responded to early comments with an extensive technical analysis of the effectiveness of the mitigation strategy, with references to multiple expert reports to support its conclusions.  (<u>Id.</u> at 727-49.)  Although Estep asserts that the conclusions of Appendix K are "flawed," he does not offer any explanation as to why the conclusions are flawed or offer any expert opinions to contradict these conclusions. Moreover, the court defers to the agency's reasonable resolution of conflicting opinions from experts, since the Service's

wildlife experts are in a much better position than the court to evaluate such evidence.  See Friends of Endangered Species, Inc., 760 F.2d at 986; Cent. Ariz. Water Conservation Dist., 990 F.2d at 1539.  Finally, although plaintiffs fault the Service for approving an HCP with less than a one-to-one mitigation ratio and cite other HCPs from surrounding areas that have higher ratios, they provide no evidence that these HCPs cover the same species, involve the same quality of habitat issues, or involve the same economic or demographic variables.

Based on the evidence in the record, the Secretary's determination that the mitigation was proportionate to the expected take of the GGS and Swainson's Hawk is not arbitrary or capricious.  However, because the NBHCP results in a net loss of habitat, including moderate and high value habitat, for both the GGS and the Swainson's Hawk, this is not one of those rare cases where the habitat to be developed is of such low value that the feasibility of further mitigation is irrelevant.

B. Feasibility of Further Mitigation

Plaintiffs argue that the Service erroneously relied on the permittees' analysis of the feasibility of additional mitigation, rather than conducting an independent analysis of practicable alternatives.  (Pls.' Mot. at 36-37.)  Plaintiffs also argue that even the economic analysis prepared by the City and Sutter supports a higher mitigation ratio.  (Id. at 30.)  The economic analysis prepared by the permittees indicates two reasons why increased mitigation, specifically a 1-to-1 mitigation ratio,

1   would not be practicable or feasible: (1) the mitigation fees

2   charged under the NBHCP are already substantially higher than

3   fees charged under the HCPs in other California jurisdictions;

4   and (2) the fees that would be charged under a higher mitigation

5   ratio might well push the costs of development beyond the

6   industry standard of feasibility.  (AR 441-444, 455-57.)

7       On the first point, the economic analysis compares the

8   proposed NBHCP mitigation fees to costs under the City of

9   Bakersfield HCP, the City of Coalinga HCP, the South Sacramento

10  HCP, and the Yolo County HCP and finds that the fees charged by

11  these jurisdictions are substantially lower than the fees

12  proposed under the NBHCP.  (Id. at 457.)  However, this analysis

13  is not dispositive on the question of feasability because the

14  level of mitigation fees the market will bear is tied to the

15  relevant real estate market and the land-use composition of the

16  development.  Therefore, without any evidence that the lands

17  covered by these HCPs have similar market conditions and land-use

18  plans, these comparisons are of little value in determining the

19  feasibility of a higher mitigation fee under the NBHCP.

20      However, the expert economic analysis also evaluates the

21  market conditions in the Sacramento region and analyzes the

22  effect of the proposed fees on the cost-effectiveness of the

23  proposed development, looking at the cost burdens imposed by the

24  combination of the proposed NBHCP fees and infrastructure fees,

25  such as fees for schools, water, wastewater, and traffic.  (Id.

26  at 441-44, 457-60, 494.)  The analysis finds that the estimated

total fees for residential development within the permit areas
would be approximately 13-14% of the estimated sales price of a
residential unit.  (Id. at 441.)  It also finds that a 15% fee
burden is generally the "feasibility benchmark" for residential
development, although a 20% cost burden may be feasible,
depending on specific financial considerations.  (Id.)

The analysis determines that alternatives calling for
increased mitigation would not push the cost burden beyond the
15% benchmark under current conditions, but offers two reasons
why increased mitigation might become infeasible.  First, the
analysis notes the City originally adopted a low infrastructure
fee for the North Natomas area that eliminated certain funding
and programs, including funding for police, fire services, bike
trails and community center facilities.  (Id. at 441, 443, 457-
60.)  However, that fee program is currently under revision, and
the development impact fees are anticipated to increase, raising
the overall fee burden.  (Id.)  Second, because the mitigation
fees are not capped, and land acquisition prices are rising
rapidly, the mitigation fees might be increased substantially to
generate the funds necessary to buy mitigation lands.  The
analysis notes that this is particularly likely if mitigation is
required at a 1-to-1 ratio, because developable land would become
even more scarce.  (Id.)

The Findings and Recommendations consider the economic
analysis offered by the permittee and also offer three further
reasons why additional mitigation is impracticable.  (Id. at

1193.)  First, the Findings and Recommendations point out that
there is no cap on the mitigation fee over the 50-year term of
the plan.  (Id.)  Second, the Service notes that the mitigation
fee more than doubled since the time the economic analysis was
prepared, so that the cost burdens might now be at or past the
industry benchmarks of feasibility.  (Id.)  What was theoretical
at the time the economic analysis was prepared, has become the
reality.  Finally, the Findings and Recommendations state that
further fee increases are expected in the future, which could
push costs beyond the industry benchmarks for feasibility.  (Id.)

   Plaintiffs contend that: (1) the project applicants did not
examine an adequate range of alternatives; (2) the economic
analysis does not support the finding of "impracticability"; and
(3) the Service's two-page analysis is insufficient to support
the finding of impracticability.  (Pls.' Mot. at 38-39.)  As to
the first argument, defendants did consider two alternatives that
called for an increased mitigation ratio.   (AR 3351.)
Plaintiffs do not indicate what other alternatives should have
been considered or cite any legal precedent to support this
position. (Pls.' Reply at 36.)  Plaintiffs' second argument --
that the economic analysis does not support a finding of
impracticability -- is based on a flawed interpretation of the
word "practicable" as used in the statute.  Plaintiffs assert
that since the economic analysis does not state that increased
fee levels are totally infeasible, the City and Sutter have not
met their burden of showing that additional mitigation would be

impracticable.   (Id. at 37-38; Pls.' Mot. at 39.)   As this court

previously found in Metro Air Park, 306 F.Supp.2d at 928 n.12,

"practicable" as used in the ESA does not simply mean "possible,"

as opposed to impossible, but has the more nuanced meaning of

"reasonably capable of being accomplished."   The economic

analysis noted a number of uncertainties that could push the fee

burden beyond the feasibility benchmark and doom all development.

In light of these uncertainties, and the rapid rise in fees noted

in the Findings and Recommendations, the Service rationally

concluded that additional mitigation was not "reasonably capable

of being accomplished" without jeopardizing the proposed

development.   Ultimately this question is not a matter of

arithmetic based on firm figures and projections but a judgment

call given the uncertainties of the real estate market and the

various other factors that affect development costs and rewards.

In the circumstances here, particularly in light of rapidly

rising land costs, the Secretary's finding represents a

reasonable judgment.

     Plaintiffs' final argument is that the Service abrogated its

duties by relying on the analysis of the permit applicants to

determine whether additional mitigation would be practicable.

However, the case relied on by plaintiffs, Gerber v. Norton, 294

F.3d 173, 185 (D.C. Cir. 2002), is readily distinguishable.   In

Gerber, the Service relied on the developer's word that the

proposed alternative was impracticable, without any supporting

analysis.   294 F.3d at 185.   Here, the City and Sutter provided

an extensive expert analysis to substantiate the conclusion that additional mitigation was not practicable.  Furthermore, the Service went beyond the information provided by the City and Sutter, noting, for instance, that mitigation fees had increased significantly since the economic analysis was prepared.[15]

Based on the foregoing analysis, the finding of the Secretary that the NBHCP would minimize and mitigate the impacts of the proposed action to the maximum extent practicable is not arbitrary and capricious.  The Service and the Secretary evaluated both proportionality and practicability and rationally determined that the proposed level of mitigation: (1) would effectively compensate for the injury to species that would occur under the ITPs; and (2) was the maximum practicable in the circumstances.

V.  <u>Failure to Ensure Adequate Funding</u>

Plaintiffs' final claim is that the NBHCP fails to ensure adequate funding for the plan, as required by 16 U.S.C. § 1539(a)(2)(B)(iii).  (Pls.' Mot. at 40.)  Plaintiffs make three arguments as to why funding is not ensured: (1) the NBHCP relies on unfunded voluntary measures such as setbacks and connectivity;

---

[15] Plaintiffs also contend that the Service had a duty to inquire whether a modified development scenario -- for example, commercial as opposed to residential -- would have been possible and permitted additional mitigation.  (Pls.' Reply at 37-38.) However, plaintiffs have not provided any legal precedent for this position and the court previously rejected a similar argument.  <u>See</u> <u>Metro Air Park</u>, 306 F.Supp.2d at 928 (holding that it is best to "avoid unduly enmeshing the Service in developers' economic affairs and projections.").

1   (2) the permittees have not "guaranteed" that they will fund the

2   mitigation plan in the event that the developer fees prove

3   inadequate; and (3) developers are immune from retroactive fee

4   increases.  (Id.; Pl.'s Reply at 39-41.)  With regard to the

5   first argument, as discussed above in Section III.A, the NBHCP

6   does not rely on unfunded voluntary measures to ensure success --

7   funds are provided for ensuring connectivity and the plan does

8   not "rely" on the 800-foot setback zones, which are merely a

9   preferred acquisition criteria.  (AR 135, 140-41.)

10          The second and third arguments are based on the same

11  hypothetical fact scenario.  Plaintiffs assert that since the

12  fees will be set and then paid by developers on an annual basis,

13  the fees collected may be insufficient if property costs increase

14  between the time the fees are collected and the time mitigation

15  lands are purchased.  (Pls.' Mot. at 40.)  As a result,

16  plaintiffs argue, funding for the NBHCP has not been "ensured" by

17  the City and Sutter.[16]  (Id.)  However, the NBHCP includes

18  several fail-safe provisions to protect against rising land costs

19  during the period between collection of fees and acquisition of

20  reserve lands.  First, the NBHCP requires the NBC to maintain a

21  200-acre "cushion" of reserve lands, so that development will not

22  outpace the acquisition of mitigation land.  (AR 213-14.)

23

24          [16] Plaintiffs point to some speculation by the court in

25  Natomas I "that it is not clear that a funding mechanism that is
    not backed by the applicant's guarantee could ever satisfy the

26  requirement of § 1539(a)(2)(B)(iii)."  This language is not
    holding and merely raises a question that is answered in this
    opinion.

Second, if land acquisition costs increase before the City and Sutter have an opportunity to adjust the mitigation fees, the developer can be required to dedicate land rather than paying the fee.  (<u>Id.</u> at 804, 1195.)  Although plaintiffs argue that "funding shortfalls" are still possible with land dedications, the court fails to see how this could occur; if there is a dedication of the required mitigation land, the landowner will not have to pay the land acquisition component of the mitigation fee, and the NBC will obtain the appropriate amount of reserve land.  Third, the "catch-up" fee ordinances further protect against rising land costs, as they narrow the window between fee payment and acquisition of mitigation land.  (<u>Id.</u> at 212.)  Finally, unlike the funding mechanism found inadequate in <u>Natomas I</u>, the mitigation fees are not capped under the NBHCP, so that fees can be increased to compensate for rising land costs.  (<u>Id.</u> at 212.)

     In the Findings and Recommendations, the Service relied on all of these elements to find that the City and Sutter had adequately ensured funding for the plan.  (<u>Id.</u> at 1194-96.)  While it is true, as plaintiffs assert, that developers are protected from retroactive fee increases, plaintiffs have not pointed to any evidence in the record suggesting that such retroactive fee increases would be necessary under the NBHCP.  The NBHCP is structured to avoid the need for retroactive fee increases through foresight and advance planning.  Plaintiffs have not shown that the NBHCP, as structured, will not adequately

fund the required mitigation.   The finding of the Secretary that
the plan adequately ensures funding is not arbitrary or
capricious.

VI.   <u>Conclusion</u>

   For the foregoing reasons, defendants' motion for summary
judgment is GRANTED and plaintiffs' motion for summary judgment
is DENIED.   The clerk shall enter judgment.

   IT IS SO ORDERED.

Dated: September 7, 2005


_____
                                 DAVID F. LEVI
                                 United States District Judge